IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 22, 2018 Session

**DEMARCUS ANT-JUAN NELSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 104333    Steven Wayne Sword, Judge**

_____

**No. E2017-01418-CCA-R3-PC**

_____

Petitioner, Demarcus Nelson, appeals the denial of his post-conviction petition. Petitioner argues that he received ineffective assistance of counsel in litigating his motion to suppress; that the State presented false testimony at the suppression hearing; that trial counsel was ineffective in failing to provide accurate advice concerning the gang enhancement statute; and that his guilty plea was involuntary. Following a review of the briefs of the parties and the entire record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Mark E. Stephens, District Public Defender; and Jonathan Harwell and Jessica Greene, Assistant Public Defenders, Knoxville, Tennessee, for the appellant, Demarcus Nelson.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Charme P. Allen, District Attorney General; and Ken Irvine and Philip Morton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Background*

Petitioner was indicted on one count of possession with intent to sell and one count of possession with intent to deliver .5 grams or more of a substance containing cocaine within 1000 feet of a school. *See* Tenn. Code Ann. §§ 39-17-417, 432 (2010). He filed a motion to suppress evidence that he alleged was recovered as a result of his illegal seizure, which was denied by the trial court. Petitioner then entered a plea of

guilty to possession with intent to sell .5 grams or more of a substance containing cocaine within 1000 feet of a school. The second count was dismissed. Pursuant to the plea agreement, the trial court sentenced Petitioner to twenty years in confinement. The plea agreement also provided for reservation of a certified question of law as to whether Petitioner's seizure was lawful. On appeal, this court affirmed the judgment of the trial court. *State v. Demarcus Nelson*, No. E2013-01414-CCA-R3CD, 2014 WL 4065649 (Tenn. Crim. App. Aug. 18, 2014).

The facts of the suppression hearing as set forth by this court on appeal are as follows:

> At the suppression hearing, Officer Brandon Stryker with the Knoxville Police Department ("KPD") testified. At the time of the events in question, Officer Stryker was assigned to the "repeat offender squad," which was "tasked with investigations dealing with narcotics, gangs, prostitution, gambling, [and] things of that nature." He had experience and training investigating narcotics cases and personally had witnessed numerous narcotics transactions. Officer Stryker testified that he had a "very intimate knowledge" of a particular residence located at 301 Cansler Avenue ("the residence") because it had been "a chronic problem for drug transactions . . . specifically, the front porch of that residence." The repeat offender squad had conducted at least seven undercover purchases of cocaine at the residence, and Officer Stryker personally was involved with two of those operations. Officer Stryker also testified that it was "common knowledge" that the residence was a "hangout" for a gang known as the "Five Deuce Hoover Crips."
>
> On February 27, 2012, Officer Stryker went to the residence with another officer, Sergeant Shaffer, in order to execute several arrest warrants for individuals known to "either live or loiter" there. The warrants were all for selling narcotics. Sergeant Shaffer drove by the residence in an unmarked vehicle and "confirmed that at least two of those individuals that he had an outstanding warrant on were present on the front porch." Officer Stryker drove up to the residence along with Sergeant Shaffer and three other officers. All of the officers were wearing plain clothes, a badge, and vests that said "police" on them in large letters. As they drove up, Officer Stryker observed several individuals on the porch, but he could not identify them. They parked on the side of the residence approximately ten to fifteen feet from the front porch. Officer Stryker testified, "[I]mmediately, as I exited the vehicle, I observed the [D]efendant run to the rear of [the residence]. Run to the rear towards the alley." Officer Stryker pursued the Defendant. Officer Stryker recalled that, as the Defendant turned and continued down an

alley, he observed the Defendant "throw a couple of small items onto the roof of the front porch of 324 Douglas Avenue," which was nearby behind the residence. At that point, Officer Stryker ordered the Defendant to stop, and the Defendant complied.

After the Defendant stopped, Officer Stryker arrested and searched him. The search did not uncover anything of significance. Officer Stryker testified,

> I reasonably thought that [the Defendant] had thrown narcotics immediately, and I contacted the Knoxville Fire Department and requested their assistance to get a ladder to get on top of that porch. They responded, and then I utilized one of their ladders, and I personally walked up the ladder to the top of the porch where I found two small baggies.

Officer Stryker's belief that the Defendant had thrown narcotics was based on his experience, the behavior he observed, and the history of the residence as a center of narcotics and gang activity. From the roof, Officer Stryker recovered one bag of a rock-like substance weighing approximately 3.2 grams and one bag of a powder substance weighing 5.1 grams.

On cross-examination, Officer Stryker denied that he shouted "police" as he exited his vehicle, but he believed that one of the other officers may have done so. Multiple police vehicles, some of them marked, also arrived at the residence around the same time as the vehicle in which Officer Stryker was riding. He confirmed that one of the other individuals on the porch was arrested pursuant to the outstanding warrants. Officer Stryker testified that his initial intention upon exiting the car was to determine the Defendant's identity. He testified, "[O]nce [the Defendant] ran, I reasonably believed that he was one of the individuals named in that presentment or—and/or was in possession of narcotics, based on my previous experience with that residence." Officer Stryker stated that he never "got a good look" at the Defendant before he ran. Officer Stryker did have a weapon when he was chasing the Defendant and, when he ordered the Defendant to stop, Officer Stryker warned the Defendant that he would shoot if the Defendant did not stop.

In response to questions by the court, Officer Stryker clarified that, although he could not be sure, he believed that it was "more than likely" that the Defendant began to run before "police" was shouted.

Following the suppression hearing, the trial court issued a written order denying relief. The trial court concluded, based on the fact that the "atmosphere of a fast showing of overwhelming police force, with the intent to serve arrest warrants at a known drug location," that "the [D]efendant was seized when Officer Stryker began chasing the [D]efendant." Based on the totality of the circumstances, the trial court concluded that the seizure constituted a brief investigatory stop requiring reasonable suspicion supported by specific and articulable facts. In determining whether Officer Stryker had reasonable suspicion, the trial court noted,

> Officer Stryker testified to a lengthy investigation concerning drug and gang activity on this very porch. Drug transactions had actually been videotaped occurring at this location. The officer had personally conducted three out of seven controlled buys here. This was not the [D]efendant's home. In addition, the officer had reason to believe that a specific gang was using this location for conducting their illegal activity.

The trial court further considered "the [D]efendant's unprovoked flight" and also found that "Officer Stryker had reason to believe that the fleeing individual was one of the wanted persons" for whom the officers had a warrant. Based on all of this, the trial court held that Officer Stryker had reasonable suspicion based on specific and articulable facts that the Defendant was engaged in criminal activity and concluded that the seizure was lawful. Accordingly, the trial court denied the Defendant's motion to suppress.

*Demarcus Nelson*, 2014 WL 4065649, at *1-3.

Petitioner's appellate counsel did not file an application for appeal to the Tennessee Supreme Court pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure or a motion to withdraw as counsel. *DeMarcus Ant-Juan Nelson v. State*, No. E2015-01247-CCA-R3-PC, 2016 WL 3563696, at *1 (Tenn. Crim. App. June 22, 2016). Petitioner filed a subsequent petition for post-conviction relief requesting that in addition to his other post-conviction claims, the post-conviction court grant him permission to file a delayed application for permission to appeal to the Tennessee Supreme Court. *Id*. The post-conviction court granted Petitioner a delayed appeal but dismissed his remaining post-conviction claims. On appeal, Petitioner argued and the State conceded, that "under Supreme Court Rule 28, the post-conviction court should have held all post-conviction claims asserted in the petition in abeyance until after the resolution of the Rule 11 delayed appeal. *Id*. at *2. This court held that the post-conviction court failed to properly follow Supreme Court Rule 28 and should have "bifurcated the proceedings and

- 4 -

conducted a hearing solely on the Rule 11 claim. See Tenn. Sup. Ct. R. 28, §8(D)(3)." This court further held: "Once the post-conviction court determined that the Petitioner was deprived of his right to request an appeal under Rule 11, the court should have granted the delayed appeal and stayed the remaining post-conviction proceedings until final disposition of the delayed appeal." *Id*. While Petitioner's appeal was pending in this court, the Tennessee Supreme Court on January 2, 2016, denied his application for permission to appeal. *Id*. This Court reversed "the post-conviction court's ruling on all of the Petitioner's claims except for the grant of the delayed application for permission to appeal pursuant to Rule 11" and remanded the "case to the post-conviction court for an evidentiary hearing on the Petitioner's remaining claims for post-conviction relief." *Id*. A hearing on Petitioner's claims for post-conviction relief was held, and the post-conviction court denied the petition.

*Post-Conviction Hearing*

At the post-conviction hearing, Officer Brandon Stryker of the Knoxville Police Department noted that he had previously testified at the preliminary hearing, the suppression hearing, and a parole revocation hearing in Petitioner's case. He was the officer who arrested Petitioner and was the lead officer in prosecuting Petitioner's case. Officer Stryker recalled meeting with other officers on Carrick Street prior to Petitioner's arrest. The arrest occurred on February 27, 2012. He said: "Sergeant Shaffer had advised us that some indictments had come back, specifically for individuals that had loitered or lived at that residence, 301 Cansler Avenue, and that we were going to serve those warrants." Officer Stryker testified that the only individual that he was familiar with was Alfred Lamar Griffin whom Officer Stryker knew had an outstanding warrant. He did not recall the other individuals mentioned by Sergeant Shaffer. Officer Stryker testified that Sergeant Shaffer at some point drove by the residence on Cansler and saw two of the individuals who had warrants at the house. Sergeant Shaffer also said that someone he identified as "Pig" was there. Officer Stryker testified that he was not familiar with the nickname "Pig." He did not ask Sergeant Shaffer about "Pig" because they were trying to get to the Cansler residence before anyone left.

Officer Stryker testified that he, Sergeant Shaffer, and Investigator Jones rode together to the residence and stopped approximately ten to fifteen feet from the porch of 301 Cansler. At that time, there was no discussion of "Pig" being on the porch, and Sergeant Shaffer did not provide any further information about "Pig." Officer Stryker testified:

> We drove up. I opened by door, and I observed a black male run around the southeast corner of the house in a north direction. Basically, going around that, you can't see the corner on the video, go around the opposite corner over there, and then run towards the ally [sic] behind the house.

The man was identified as Petitioner whose nickname was "Pig."

Officer Stryker clarified that any information that Sergeant Shaffer had given him about "Pig" was given to him prior to their arrival at 301 Cansler. At that point, Petitioner's counsel played a portion of the recording from Petitioner's preliminary hearing and said that Officer Stryker had "now testified contrary to what [Petitioner believed] he testified at the preliminary hearing." Officer Stryker testified that Sergeant Shaffer did not indicate that he had a warrant for "Pig," and he reiterated that he was not familiar with an individual named "Pig." Officer Stryker testified that he was familiar with Alfred Lamar Griffin and planned to focus on him when they arrived at the residence to serve the warrants. However, he began chasing Petitioner after they arrived.

On cross-examination, Officer Stryker said that he had not testified at the post-conviction hearing any differently than the other three times that he had testified concerning Petitioner's case. At the suppression hearing, parole hearing, and the preliminary hearing, Officer Stryker testified that he did not know Petitioner prior to going to 301 Cansler Avenue to serve warrants. The only information that he had from Sergeant Shaffer was that someone named "Pig" was on the porch. Officer Stryker said that he also previously testified at all three hearings that Petitioner ran when he drove up to the residence and opened the door and that he did not know at the time the identity of the person who ran or whether the person had outstanding warrants. At the preliminary hearing, Officer Stryker testified that at least two of the individuals with outstanding warrants had been identified prior to his arrival at 301 Cansler Avenue. Officer Stryker testified that he did not know anything about Petitioner when Petitioner ran away, and he wanted to identify Petitioner to see if he was one of the individuals with a warrant.

On re-direct examination, Officer Stryker was not surprised to learn that he did not mention the nickname "Pig" at the suppression hearing. In reviewing the transcript of the suppression hearing, Officer Stryker noted that he was not asked about that information. When asked at the suppression hearing whether Sergeant Shaffer mentioned Petitioner's name, Officer Stryker replied, "Not his name, no sir." Officer Stryker testified that he gave that answer at the suppression hearing because Sergeant Shaffer had only told him that someone named "Pig" was on the porch. Officer Stryker said that he did not know Petitioner or that he was the person associated with the nickname "Pig."

Sergeant Joshua Shaffer of the Knoxville Police Department testified that he organized the serving of "capiases" at 301 Cansler Avenue. He said that the only capias that was to be served on February 27, 2012, was for Alfred Griffin. Sergeant Shaffer noted that there were a total of seven or eight capiases issued at various times for other individuals in the case, including co-defendants Tashia Griffin, Keith Wilson, and Tracy Dale Tate. He noted that they were not looking for Petitioner on February 27, 2012. On that day, Sergeant Shaffer drove by the residence at 301 Cansler Avenue, and he saw Mr.

Griffin standing outside. He recalled telling other officers that Mr. Griffin was at the residence and that he intended to make contact with Mr. Griffin. Sergeant Shaffer did not recall providing the other officers with a photograph of Mr. Griffin. He further testified:

> Whenever I drove by and observed Mr. Griffin standing out there, I'd observed some other people that were on the porch. I didn't know exactly who they were. Again, there were at least, at that time, two other male individuals that were also wanted on those capiases. I didn't know if they were there or not. 301 Cansler at that time was a - - it was a known hangout for gang members. There have been a couple of shootings there. So if there's four or five people on the porch and I don't know how many of them are wanted - - I know Mr. Griffin is there. Mr. Griffin had had prior gun charges before, then yes, I'm going to get a couple of people to go with me when I go to take him into custody.

Sergeant Shaffer viewed the video from February 27, 2012, from Officer Thurmond's Patrol car. Sergeant Shaffer identified himself and other officers, including Officer Stryker, on the scene at Cansler Avenue, and he also identified the vehicles used to transport the officers to the scene. Sergeant Shaffer explained that he was the only officer who drove by the residence before attempting to serve the capias there and that the trip took place before the events displayed on the video from Officer Thurmond's patrol car. He saw several individuals on the porch when he drove by but the one that he specifically remembered was Mr. Griffin. Sergeant Shaffer testified that he then notified the other officers that he saw Mr. Griffin. He further testified that his "intent was to go get him, and if there were other people there that could be the ones that were included in there - - in the other capiases." Sergeant Shaffer noted that Officer Jones and Officer Stryker rode back to 301 Cansler Avenue with him, and they were the first vehicle to arrive on the scene. Sergeant Shaffer did not recall identifying Petitioner as "Pig" when they arrived at the residence. He knew Petitioner's nickname was "Pig" and was familiar with Petitioner through "work," and the two attended school together.

Sergeant Shaffer was aware of Officer Stryker's previous testimony and that he had previously testified at the preliminary hearing. He was also aware that Officer Stryker had testified that he told Officer Stryker that "Pig" was on the porch. Sergeant Shaffer testified:

> When - - I may have said it whenever I initially got everybody together at the police academy. Whenever I said there were other people on the porch, if somebody asked who was there, I may have said "Pig." I think I remember seeing him when I drove by and saw Mr. Griffin the first time.

- 7 -

He did not recall announcing that "Pig" was on the front porch as the officers arrived at the Cansler residence to serve the capias. Sergeant Shaffer noted that he had also seen Petitioner at 301 Cansler Avenue on previous occasions. He agreed that after the passage of five years, he was unable to recall seeing anyone other than Mr. Griffin on the front porch when he drove by earlier but said that he may have seen Petitioner. Sergeant Shaffer testified that he was focused on Mr. Griffin and taking him into custody. If Mr. Griffin had not been at the residence, Sergeant Shaffer would have waited for a time when he was present on the porch.

Trial counsel testified that he was hired to represent Petitioner at the general sessions level. He recalled reviewing several videos surrounding Petitioner's arrest in an attempt to "piece together" what happened. He also filed a motion to suppress, and there was a suppression hearing. He was sure that he reviewed the transcript of the preliminary hearing in preparation for the suppression hearing. He did not specifically recall if he reviewed the video from Officer Thurmond's patrol car. Trial counsel agreed that the focus of the suppression motion was whether or not the police had a right to stop Petitioner and whether or not they knew his identity at the time the officers attempted to stop him. Trial counsel did not specifically recall Officer Stryker's testimony at the preliminary hearing.

Trial counsel testified that he negotiated a plea agreement on Petitioner's behalf, and a certified question was reserved as part of the agreement. When asked if he recalled the specifics of the plea agreement, trial counsel testified:

> I don't recall. I know it was a lot of time, and I - - you know, I felt bad about that. You know, the issue was go to trial, and if we lost, he'd get more time, but he was going to have to plead to some time, but we could at least appeal the issue on - - the issue could be appealed.

He did not recall if the prosecutor made any reference to gang enhancement. When asked if he discussed gang enhancement with Petitioner, trial counsel testified that "there may have been some discussion of gang enhancements just because there were several people there when [Petitioner] decided to leave the scene." However, he could not say for certain if the prosecutor threatened gang enhancements in Petitioner's case.

Trial counsel identified a piece of paper with handwriting that appeared to be his notes on plea offers. He said that he "probably" showed the document to Petitioner. The document had three sections, and the top section read: "Charge A. Range II +gang. @25-40. 100% first 25, 35% anything over." The middle section appeared to contain the agreements offered by the State, the first of which read: "If do appeal: A 20 I 30, 100% 1st 25, 30% next five years." The second read: "Drop appeal: B 15 Range II, 12 @100, 3@35%." The third one read: "Or reset and look at gang stuff. Max @ 100%." The last section of the document read: "20 @ 35% & keep appeal." Trial counsel indicated that

the last section of the document may have contained Petitioner's counteroffer. Trial counsel thought that he and Petitioner discussed the plea offers "in the dock here." He did not recall how many other inmates were present at the time, but it was possible that there were others around when he discussed the plea offers with Petitioner. Trial counsel testified that he usually did not discuss potential gang enhancement with a client unless it was raised in some way by the State. He said that he was "generally" familiar with the gang enhancement statute.

On cross-examination, trial counsel noted that the school zone enhancement would enhance Petitioner's charges for possession with intent to sell and possession with intent to deliver more than .5 grams of cocaine from a Class B to a Class A felony. He had also been provided notice that Petitioner was a Range II offender. Trial counsel also noted that the sentencing range for a Range II offender on a Class A felony is twenty-five to forty years. The first twenty-five years would also have to be served at one hundred percent. The balance of the sentence if above twenty-five years, would be served at thirty-five percent. Trial counsel noted that all of the "years and percentages" on the handwritten document had nothing to do with a gang enhancement. He agreed that the document presented three options: a plea with a certified question; a plea without an appeal; and resetting the case to look into the gang enhancement. Trial counsel was unsure what the "max at a hundred percent" meant that was also written on the document. He said that if all three offers were made to Petitioner then he would have discussed them with Petitioner. It was ultimately Petitioner's decision whether to plead guilty.

It was trial counsel's experience that most of his clients sought a plea agreement with the shortest sentence, which was how the first two offers on the handwritten document were structured. He thought that the third offer was a counteroffer because it contradicted the second option and outlined a shorter sentence. The plea offer that Petitioner actually accepted was the first offer on the document that was circled. Trial counsel noted that Petitioner struggled with the decision to plead guilty but that it was Petitioner's decision.

On redirect examination, trial counsel testified that he was "pretty confrontational" until Petitioner's motion to suppress was denied. At that point, trial counsel attempted to "work it out" as best he could. Trial counsel testified that he did not discuss any potential constitutional challenges to the gang enhancement statute. He did not recall explaining the gang enhancement statute in detail to Petitioner but he indicated that he probably advised Petitioner that the State would have to seek a superseding indictment for the gang enhancement to apply. Trial counsel testified that "this reset and look at the gang stuff, it just sort of indicates to me that it – it may not have been in there to begin with." He admitted that he could recall very few details about the matter.

*Analysis*

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103; *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal petitioner has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687. Failure to satisfy either prong results in the denial of relief. *Id.* at 697.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he or she would not have pled guilty but would instead have insisted on proceeding to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *House v. State*, 44 S.W.3d 508, 516 (Tenn. 2001).

## I.    Motion to Suppress

Petitioner first asserts that trial counsel was ineffective in litigating his motion to suppress. This court has previously addressed the evidence necessary at a post-conviction hearing in the context of ineffective assistance of counsel concerning a motion to suppress:

> It is well settled that when a [p]etitioner in post-conviction proceedings asserts that counsel rendered ineffective assistance of counsel by failing to call certain witnesses to testify, or by failing to interview certain witnesses, these witnesses should be called to testify at the post-conviction hearing; otherwise, Petitioner asks the [c]ourt to grant relief based upon mere speculation. *Black v. State,* 794 S.W.2d 752, 757 (Tenn. 1990). The same standard applies when a [p]etitioner argues that trial counsel was constitutionally ineffective by failing to file pre-trial motions to suppress evidence. In order to show prejudice, Petitioner must show by clear and convincing evidence that (1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested. *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064 - 65). **In essence, the petitioner should incorporate a motion to suppress within the proof presented at the post-conviction hearing**. On issues such as the ones in the case *sub judice*, it is likely a rare occasion indeed when the testimony of only the Petitioner and the trial counsel could provide proof of the merit of a suppression motion based upon a warrantless search. If trial counsel had filed the motions to suppress evidence that Petitioner claims should have been filed, there is no evidence in the record to justify granting the motions.

*Terrance Cecil v. State,* No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. Sept. 12, 2011)(emphasis added), *no perm. app. filed.* The fact that a particular strategy or tactic failed does not equate with deficient performance. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Concerning this issue, the post-conviction court found:

A. Knowledge of petitioner's identity

In paragraph 5 of his petition, the petitioner alleges that [trial counsel] provided ineffective assistance of counsel by failing to elicit proof during the suppression hearing that [Sergeant] Shaffer knew who the petitioner was when they arrived at the house to arrest the other

- 11 -

individual(s). He argues that [trial counsel] should have shown during the suppression hearing that since [Sergeant] Shaffer knew that the person running from the house was not one of the persons they had an arrest warrant for, that the subsequent chase by Officer Stryker and seizure of the petitioner was unconstitutional.

The defendant bases his argument on testimony from Officer Stryker at the preliminary hearing that [Sergeant] Shaffer had told Officer Stryker, and others, prior to approaching the house that a person known as "Pig" was on the porch. He argues that since [Sergeant] Shaffer knew who "Pig" was and that no warrants were pending for "Pig," then that knowledge should be imputed to Officer Stryker. He concludes that since Stryker is imputed to know that the person he was chasing was "Pig," then the chase/seizure was unconstitutional. Had [trial counsel] brought forth this prior testimony, the court would have granted Petitioner's motion to suppress.

The court disagrees with the petitioner's theory. Officer Stryker had been consistent each time he has testified that he did not know who the petitioner was when he ran from the police upon their arrival at the home. He was not familiar with the petitioner specifically. It was completely reasonable for Officer Stryker to suspect that the person fleeing from the house was one of the persons they were there to arrest on outstanding warrants.

Had [trial counsel] asked Officer Stryker about his testimony at the preliminary hearing, there is no reason to believe Officer Stryker would have said anything different. He stated the same thing at the post-conviction hearing. Even if you assume Officer Stryker knew that "Pig" was at the house, it does not follow that he should have known that it was "Pig" who ran. He didn't know what "Pig" looked like. There is no reason to believe that Officer Stryker knew the person running away was "Pig" or anyone else who did not have outstanding warrants. Thus, the court finds that [trial counsel] was not deficient in failing to elicit proof that [Sergeant] Shaffer knew "Pig." It only mattered what, or who, Officer Stryker knew and that he knew about the person he was chasing.

B. Prior inconsistent Statements of Stryker

In paragraph 6 of his petition, the petitioner claims that his attorney was ineffective during the suppression hearing by failing to impeach Officer Stryker's testimony with prior inconsistent [s]tatements and video-graphic evidence. He argues that Officer Stryker gave inconsistent testimony during the suppression hearing from what he said

during the preliminary hearing. Specifically, he believes Officer Stryker was inconsistent in his testimony of whether the officers knew who "Pig" was and if he was one of the persons on the porch. He also claims that one of the cruiser videos contradicted the time-line presented by Officer Stryker as to when [Sergeant] Shaffer briefed them at the rally point to the approach of the residence.

After a thorough review of Officer Stryker's testimony during the preliminary hearing, suppression motion, and post-conviction hearing, the court is unable to find any inconsistency in Officer Stryker's testimony concerning his knowledge of who the person was that he was chasing. He has maintained all along that he did not know the petitioner prior to this encounter. The fact that [Sergeant] Shaffer may have known the petitioner prior to the encounter is irrelevant to the issues presented in this case. It would be improper for the purposes of determining the constitutionality of the seizure of the petitioner to require Officer Stryker to know exactly what Officer Shaffer knew about the individuals at the location. Again, the only relevant information is what Officer Stryker knew or didn't know about the person he was chasing.

Furthermore, the court does not find that the cruiser video in question contradicts Officer Stryker's testimony concerning [Sergeant] Shaffer driving by the residence prior to the arrest. The video does depict that [Sergeant] Shaffer was present at the assembly location before the raid. The fact that he may have been there twenty minutes instead of a "few minutes" prior to the raid is not inconsistent with the testimony provided by either Officers Stryker or Shaffer. Had this video been presented to the court during the suppression hearing, it would not have made a difference in the court's decision on the motion, nor would it have made a difference to the appellate court.

The court finds that Officer Stryker has not rendered inconsistent testimony in this area, or any other area related to this case as alleged in [ ] the petition and memorandum in support of the petition. Therefore, the court finds that the petitioner has failed to show that his attorney was ineffective in not pursuing alleged inconsistent testimony by Officer Stryker. Any inconsistencies, if they exist, are minor and would not have made a difference in the trial court's ruling on the motion to suppress. Thus, the petitioner had not suffered prejudice.

The record supports the trial court's findings. In this case, Petitioner has not shown by clear and convincing evidence that trial counsel was ineffective in his handling of the motion to suppress. Petitioner argues that at the suppression hearing, trial counsel should have established that Officer Stryker had information and could not have reasonably

believed that there was a warrant for Petitioner's arrest; that Sergeant Shaffer knew Petitioner personally and that there was no warrant for him, and "thus the detention by one of Sergeant Shaffer's subordinates, brought to the scene at Sergeant Shaffer's request and under his direction, was not constitutional;" and that trial counsel should have established that, "contrary to Officer Stryker's testimony, only one wanted individual (not two) had been seen on the porch, and there was thus again no reason to believe a warrant existed for [Petitioner]."

We find that trial counsel could not have shown that Officer Stryker knew Petitioner at the time of the arrest and that Petitioner had no outstanding arrest warrant. Officer Stryker consistently testified at the preliminary hearing, the suppression hearing, and the post-conviction hearing that he did not know Petitioner's identity at the time that he arrested Petitioner or that Petitioner was not one of the individuals at 301 Cansler Avenue for whom the officers had outstanding warrants. He knew that someone whose nickname was "Pig" was on the porch at the residence but he did not know that Petitioner was "Pig." The fact that Sergeant Shaffer may have personally known Petitioner is irrelevant to what Officer Stryker knew.

Petitioner argues that Officer Stryker testified inconsistently because he testified at the suppression and post-conviction hearings that Sergeant Shaffer informed the group of officers that he saw two people with outstanding warrants at the Cansler Avenue residence when he drove by. However, Sergeant Shaffer recalled identifying only one individual, Alfred Griffin, when he drove by the residence. At the post-conviction hearing, Sergeant Shaffer noted that there were a total of seven or eight capiases issued at various times for other individuals in the case, including co-defendants Tashia Griffin, Keith Wilson, and Tracy Dale Tate. He further testified:

> Whenever I drove by and observed Mr. Griffin standing out there, I'd observed some other people that were on the porch. I didn't know exactly who they were. Again, there were at least, at that time, two other male individuals that were also wanted on those capiases. I didn't know if they were there or not. 301 Cansler at that time was a - - it was a known hangout for gang members. There have been a couple of shootings there. So if there's four or five people on the porch and I don't know how many of them are wanted - - I know Mr. Griffin is there.

Therefore, Sergeant Shaffer acknowledged that there could have been other individuals at the residence with outstanding warrants. Petitioner has not shown that Officer Stryker testified inconsistently or that he knew that Petitioner was not one of the individuals with an outstanding warrant. The post-conviction court properly concluded that trial counsel was not deficient for failing to elicit testimony that Officer Stryker knew Petitioner's identity before arresting him.

Even if trial counsel's performance was deficient concerning the motion to suppress, Petitioner has not shown any prejudice in that his motion to suppress would have been granted. On appeal, this court upheld the trial court's denial of Petitioner's motion to suppress:

> In the instant case, Officer Stryker testified that he and several other officers parked their vehicle in front of the residence near where the Defendant was standing on the front porch. Officer Stryker and the other officer[s] simultaneously exited the vehicle wearing badges and vests with "police" on them in large letters, and Officer Stryker had his service weapon. At the same time, multiple other marked vehicles also arrived and parked in the area immediately surrounding the residence. The purpose of the encounter was to serve arrest warrants on suspects known to frequent the residence. As soon as Officer Stryker exited the vehicle, the Defendant began to run, and Officer Stryker gave chase. It is apparent from these facts that the Defendant attempted to terminate the encounter by fleeing, and Officer Stryker pursued him. Based on those circumstances, we hold that the Defendant was "seized" within the meaning of the Fourth Amendment and article I, section 7 of the Tennessee Constitution at the moment Officer Stryker began to pursue the Defendant. *See Daniel*, 12 S.W.3d at 425-26 (holding that an officer's pursuit of an "individual who has attempted to terminate the contact by departing" constitutes a seizure).

> Having found that the Defendant was "seized" within the meaning of the federal and Tennessee Constitutions at the time Officer Stryker began his pursuit, we next must determine whether the circumstances justified the warrantless seizure. "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997) (citation omitted); *see also State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). One such exception arises "when a police officer makes an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *Binette*, 33 S.W.3d at 218; *see also Terry*, 392 U.S. at 20-21.

> There is no precise technical definition of reasonable suspicion. Rather, it is a "common sense" concept. *State v. Keith*, 978 S.W.2d 861, 867 (Tenn. 1998) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). Therefore, "[t]rial courts must examine the totality of the

circumstances when evaluating whether an officer has established the requisite level of suspicion to justify a *Terry* stop." *Moats*, 403 S.W.3d at 178-79 (citing *Binette*, 33 S.W.3d at 218). Those circumstances include "an officer's observations, information from other law enforcement personnel or agencies, information for citizens, known patterns of criminal offenders, or deductions based upon experience." *Id.* at 179 (citing *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992)). Furthermore, "the nature of the crime suspected may be a factor." *Id.* (citing *State v. Winn*, 974 S.W.2d 700, 703 (Tenn. Crim. App. 1998)). In supporting that suspicion, an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch," however, "[t]hat level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *Keith*, 978 S.W.2d at 867 (quoting *United State v. Sokolow*, 490 U.S. 1, 7-8 (1989)); *see also* Terry, 392 U.S. at 27. That is, "[a]n officer conducting an investigatory stop 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" *Nicholson*, 188 S.W.3d at 659 (quoting Terry, 392 U.S. at 21).

Our supreme court has held that flight by a suspect upon noticing police may contribute to reasonable suspicion of criminal activity. *Id.* Furthermore, the characteristics of a particular location as being associated with criminal activity "may be relevant to amassing reasonable suspicion." *Id.* (citing *Illinois v. Wardlow*, 529 U.S. 119, 124 (2000) (holding that a suspect's flight from police officers in what was known to be a "high crime area" associated with "heavy narcotics trafficking" supported reasonable suspicion)). However, neither flight from police officers nor an individual's presence in a high crime area are enough alone to give rise to reasonable suspicion absent other articulable facts. *Id.; State v. Lawson*, 929 S.W.2d 406, 408 (Tenn. Crim. App. 1996).

In the instant case, Officer Stryker had information from fellow law enforcement officers that the residence had an extensive history of narcotics and gang activity, and Officer Stryker himself personally had witnessed criminal activity at the residence on multiple occasions. Officer Stryker testified that much of the criminal activity at the residence in the past had taken place on the front porch. Therefore, based on Officer Stryker's experience, multiple individuals standing on the front porch of the residence was a known pattern of criminal activity. The fact that the Defendant immediately fled upon seeing the police contributed to Officer Stryker's suspicion that the Defendant was

engaged in criminal activity. Furthermore, the reason that the officers were present on the scene was to execute multiple narcotics-related arrest warrants for individuals known to frequent the front porch of the residence. In fact, Officer Shaffer had surveilled the residence prior to executing the warrants and confirmed that at least two of the subjects of the outstanding warrants were present on the porch. Officer Stryker testified that the Defendant fled the scene so quickly that he was not able to get a good look at the Defendant in order to ascertain whether the Defendant was one of the suspects subject to the arrest warrants. At the time he began pursuing the Defendant, Officer Stryker was under the reasonable belief that the Defendant might be one of the subjects of the outstanding warrants.

Based on the specific and unique combination of facts in this case, we hold that Officer Stryker put forward "specific and articulable facts which, taken together with rational inferences from those facts" under the totality of the circumstances, gave rise to a reasonable suspicion at the time Officer Stryker began the pursuit that the Defendant was either engaged in narcotics related criminal activity or was attempting to flee arrest pursuant to a warrant. *Nicholson*, 188 S.W.3d at 659 (quoting *Terry*, 392 U.S. at 21). Therefore, we uphold the trial court's denial of the Defendant's motion to suppress.

*Demarcus Nelson*, 2014 WL 4065649, at *5-6.

The outcome of the suppression hearing would have yielded the same result even if the evidence demonstrated that Officer Stryker knew Petitioner's identity or that he did not have an outstanding warrant at the time of his arrest. Petitioner's argument overlooks the fact that this court also upheld the denial of his motion to suppress because Officer Stryker had reasonable suspicion to detain Petitioner because he was engaged in "narcotics related criminal activity." *Id*. Petitioner's efforts to comply with the requirement to present a motion to suppress within the post-conviction hearing, *Terrance Cecil*, 2011 WL 4012436, at *8, in order to show prejudice failed to prove prejudice or deficient performance by trial counsel. The post-conviction court heard the "suppression evidence" presented by post-conviction counsel and still implicitly held that there were no grounds of an unconstitutional seizure of Petitioner. Petitioner has failed to demonstrate that trial counsel's alleged deficiency on this claim affected the outcome of the suppression hearing. Petitioner is not entitled to relief on this issue.

- 17 -

**II. Alleged False Testimony**

Petitioner contends that the State knowingly presented false testimony at the hearing on the motion to suppress in violation of Petitioner's due process rights. We disagree.

This court has held:

> "[A] conviction obtained through the use of false evidence, known to be such by representatives of the State" deprives a defendant of due process. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *see also Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. at 269, 79 S. Ct. at 1177. Therefore, when a witness testifies falsely, either on direct or cross-examination, the state has an affirmative duty to correct such false testimony. *State v. Spurlock*, 874 S.W.2d at 617.
>
> To prevail on a claim that the state knowingly presented false testimony, the appellant must show by a preponderance of the evidence "(a) that false or perjured testimony was admitted at trial, (b) that the state either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial." *Roger Morris Bell v. State*, C.C.A. No. 03C01-9210-CR-00364, 1995 Tenn. Crim. App. LEXIS 221, at *9, Hamilton County (Tenn. Crim. App. filed March 15, 1995, at Knoxville), *perm. to app. denied* (Tenn. August 28, 1995); *see also Phillip Shupe v. State*, C.C.A. No. 03C01-9804-CC-00126, 1999 Tenn. Crim. App. LEXIS 111, at *4, Bradley County (Tenn. Crim. App. filed February 9, 1999, at Knoxville).

*Register v. State*, No. 01C01-9605-CC-00199, 1999 WL 333114, at *6 (Tenn. Crim. App. May 26, 1999).

Concerning this issue, the post-conviction court found that "each and every accusation concerning the dishonesty and unethical behavior of Officer Stryker, Officer Shaffer, and the assistant district attorneys involved to be completely unfounded and without merit." The post-conviction court further stated:

> In sum, the documentation and other facts in this case show that the officers did not present perjurious testimony concerning when they went to the home on Cansler to attempt the arrest of one or more individuals

- 18 -

. . . Thus, the State did not violate any ethical rule or due process requirements in failing to disclose any information to the petitioner regarding these claims.

Petitioner asserts that Officer Stryker testified falsely at the suppression hearing when he was asked whether Sergeant Shaffer mentioned Petitioner's name. In response to the question, Officer Stryker answered, "Not his name, no, sir." Officer Stryker had been given Petitioner's nickname, which was "Pig," rather than his formal name. It is undisputed that "Pig" is not Petitioner's actual name, and Officer Stryker did not know Petitioner's actual name. Therefore, Petitioner has not shown that Officer Stryker's testimony was false.

Additionally, Petitioner contends that Officer Stryker also falsely testified at the suppression hearing that Sergeant Shaffer had told the officers before they arrived at 301 Cansler Avenue that he had seen at least two individuals at the residence with outstanding warrants. However, at the post-conviction hearing, Sergeant Shaffer testified that he only saw one of the individuals, Lamar Griffin, on the porch. Again, Petitioner has not shown that the testimony presented was false.

Officer Stryker was consistent in his testimony at the hearings that Sergeant Shaffer reported seeing two of the individuals that the officers were seeking that day at the residence. He also testified that a single person was arrested that day on an outstanding warrant. We acknowledge that Sergeant Shaffer testified at the post-conviction hearing that he identified only Alfred Griffin before serving the warrant on Cansler Avenue. However, he also testified that he was unable to determine whether two other men on the porch were among those charged in Mr. Griffin's case. Sergeant Shaffer indicated that before going to the residence, he told the other officers that Mr. Griffin was at the house, and that "there were other people there that could be the ones that were included in the – in the other capiases." Sergeant Shaffer also noted that given the passage of five years since the events in question occurred, his memory of the identities and locations of the people on the porch was inexact and that he could be mistaken on the details. This does not establish that the State presented false testimony.

We find that Petitioner has not shown that Officer Stryker's or Sergeant Shaffer's testimony was false or that the State knew that any testimony was false. Therefore, Petitioner is not entitled to relief on this issue.

### III.    Gang Enhancement

Petitioner argues that trial counsel was ineffective for failing to provide accurate advice to him concerning the gang enhancement statute. Concerning this issue, the post-conviction court found:

- 19 -

In paragraph 7 of his petition, the petitioner claims that his attorney was ineffective in advising his client during plea negotiations that he faced increased punishment under the gang enhancement statute. He argues that he was not indicted under the gang enhancement statute, therefore, his attorney should not have presented that as a possible punishment.

[Trial counsel] was unable to clearly recall his discussions with the petitioner regarding possible plea agreement resolutions. A note page from [trial counsel's] file appears to reflect the plea options being discussed. The page seems to reflect multiple alternative potential resolutions. Some of those refer to gang enhanced sentences. One note [s]tates, "or reset & look at gang stuff." All the options presented were in line with the drug free school zone enhancement to which the petitioner pled. The State argues that it could have used the threat of a super[s]eding indictment which added a gang enhancement count as part of the plea negotiation strategy. The court recognizes that this is a viable option available to the State in cases and that the State has obtained such super[s]eding indictments in other cases after plea negotiations failed. [Trial counsel] indicated that he would not have brought up the gang issue with the petitioner had someone else not mentioned it first.

Although [trial counsel] testified that the petitioner struggled with the plea offer, there is no proof that the petitioner would not have accepted the plea offer had [trial counsel] not discussed the gang enhancement statute with the petitioner. Since he did not testify, the court has no additional information from which to evaluate why the petitioner made the choice he did as to which plea offer to accept.

The court finds that [trial counsel] was not ineffective in discussing possible gang enhancement ramifications during plea negotiations. To the contrary, he may have been ineffective if he had failed to discuss potential exposure to a harsher sentence that the State may have been threatening to seek. Furthermore, the court finds that the petitioner has failed to establish that he was prejudiced by the discussion of gang enhancements, assuming that such discussion was ineffective assistance of counsel.

Petitioner did not prove this claim by clear and convincing evidence. Trial counsel did not recall if the prosecutor made any reference to gang enhancement. When asked if he discussed gang enhancement with Petitioner, trial counsel testified that "there may have been some discussion of gang enhancements just because there were several people there when [Petitioner] decided to leave the scene." However, he could not say for certain if the prosecutor threatened gang enhancements in Petitioner's case. Trial

counsel identified a piece of paper with handwriting that appeared to be his notes on plea offers. He said that he "probably" showed the document to Petitioner. The document had three sections, and the top section read: "Charge A. Range II +gang. @25-40. 100% first 25, 35% anything over." The middle section appeared to contain the agreements offered by the State, the first of which read: "If do appeal: A 20 I 30, 100% 1st 25, 30% next five years." The second read: "Drop appeal: B 15 Range II, 12 @100, 3@35%." The third one read: "Or reset and look at gang stuff. Max @ 100%." The last section of the document read: "20 @ 35% & keep appeal." Trial counsel indicated that the last section of the document may have contained Petitioner's counteroffer. Trial counsel testified that he usually did not discuss potential gang enhancement with a client unless it was raised in some way by the State. He said that he was "generally" familiar with the gang enhancement statute.

On cross-examination, trial counsel noted that all of the "years and percentages" on the handwritten document had nothing to do with a gang enhancement. He agreed that the document presented three options: a plea with a certified question; a plea without an appeal; and resetting the case to look into the gang enhancement. Trial counsel was unsure what the "max at a hundred percent" meant that was also written on the document. He said that if all three offers were made to Petitioner then he would have discussed them with Petitioner. It was ultimately Petitioner's decision whether to plead guilty.

It was trial counsel's experience that most of his clients sought a plea agreement with the shortest sentence, which was how the first two offers on the handwritten document were structured. He thought that the third offer was a counteroffer because it contradicted the second option and outlined a shorter sentence. The plea offer that Petitioner actually accepted was the first offer on the document that was circled. Trial counsel noted that Petitioner struggled with the decision to plead guilty but that it was Petitioner's decision. Trial counsel further testified that he did not discuss any potential constitutional challenges to the gang enhancement statute. He did not recall explaining the gang enhancement statute in detail to Petitioner but he indicated that he probably advised Petitioner that the State would have to seek a superseding indictment for the gang enhancement to apply. Trial counsel testified that "this reset and look at the gang stuff, it just sort of indicates to me that it – it may not have been in there to begin with." He admitted that he could recall very few details about the matter.

In his brief, Petitioner acknowledges that it "*appears* that the defendant was advised by his attorney prior to his guilty plea that, if he continued to fight the case, he could be subject to doubly-enhanced penalties under the school zone and the gang enhancement." (emphasis added). Petitioner also states in his brief that it is "*somewhat unclear* what [Petitioner] was told about the procedural aspects of the gang enhancement statute, including the requirement of a grand jury indictment." (emphasis added). Therefore, the evidence of this claim is not clear and convincing as admitted by Petitioner himself in his brief. As pointed out by the State, the evidence presented at the post-

conviction hearing does not establish how the gang enhancement statute relates to Petitioner's case or that the threat of gang enhancement was used to induce his guilty plea. Trial counsel could not recall if the prosecutor threatened gang enhancement in Petitioner's case. He could only speculate as to what the reference to gang enhancement on the hand-written document meant, and Petitioner did not testify at the post-conviction hearing.

Petitioner also complains that trial counsel did not tell him that the gang enhancement statute was unconstitutional, and that "any indictment alleging a gang enhancement would have been void." Again, as pointed out by the State, while trial counsel acknowledged that he did not advise Petitioner concerning the constitutionality of the gang enhancement statute, Petitioner has failed to establish that the constitutionality of the statute was relevant to his guilty plea, which did not include the gang enhancement. The gang enhancement statute was later found to be unconstitutional. *State v. Bonds*, 502 S.W.3d 118 (Tenn. Crim. App. 2016). However, Petitioner concedes that at the time of his plea, the gang enhancement statute had not been found unconstitutional. Trial counsel is not expected to "exercise extraordinary vision or to object to every aspect of the proceeding in the hope that some aspect might mask a latent constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 131 (1983). The failure to anticipate new constitutional case law does not constitute ineffective assistance of counsel. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).

Petitioner has not demonstrated by clear and convincing evidence that trial counsel was ineffective for failing to provide accurate advice to him concerning the gang enhancement statute. Moreover, Petitioner has not shown any prejudice because he has failed to demonstrate that but for the alleged deficiency of trial counsel, he would have rejected the plea agreement and insisted upon proceeding to trial. Therefore, he is not entitled to relief on this issue.

## IV.    Involuntary Guilty Plea

Finally, Petitioner argues that his guilty plea was involuntary because it was "induced by a threat of unconstitutional punishment." A guilty plea must be entered knowingly and voluntarily, *i.e.,* the Petitioner must have made the choice to plead guilty after being made aware of the significant consequences of such a plea. *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case *Boykin v. Alabama*, 395 U.S. 238 (1969), and the state standard as announced in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977), *superseded on other grounds by* Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). *Don Allen Rodgers*, 2012 WL 1478764, at *5. Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." *Boykin*, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his

decision was both voluntary and knowledgeable, *i.e.*, that he has been made aware of the significant consequences of such a plea . . . ." *Mackey*, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Boykin*, 395 U.S. at 242–43). "A practice that is coercive or renders a plea involuntary is one that creates improper pressure that likely would overbear the will of innocent people causing them to plead guilty." *Howell v. State*, 185 S.W.3d 319, 333-34 (Tenn. 2006). "[W]hether an accused's plea of guilty was voluntarily, understandingly, and knowingly entered is to be determined based upon the totality of the circumstances." *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[ ] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin*, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship*, 858 S.W.2d at 904; *Howell v. State*, 185 S.W.3d 319, 330-31 (Tenn. 2006). Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. *Boykin*, 395 U.S. at 244.

Initially, we point out that Petitioner did not include a transcript of the guilty plea hearing as an exhibit at the post-conviction hearing or in the record on appeal. Nor was a transcript included in the record on Petitioner's direct appeal. *State v. Demarcus Nelson*, No. E2013-01414-CCA-R3CD, 2014 WL 4065649, at *6 (Tenn. Crim. App. Aug. 18, 2014). "[W]hen a record does not include a transcript of the hearing on a guilty plea, the Court of Criminal Appeals should determine on a case-by-case basis whether the record is sufficient for a meaningful review under the standard adopted in *Bise*." *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012). The court noted that an appellate court had the authority to order supplementation of the record if necessary for review. However, the court was clear that supplementation should be ordered only if the record is otherwise inadequate to conduct a meaningful appellate review. *Id.* The record before us is sufficient for meaningful review of the challenged issue. Thus, we proceed with our review. *See State v. Monroe Mangium, Jr.*, No. W2012-00315-CCA-R3-PC, 2013 Tenn.

Crim. App. LEXIS *36 (Tenn. Crim. App. Jan. 15, 2012) (appeal from the denial of a post-conviction petition alleging ineffective assistance of counsel without the benefit of a transcript of the guilty plea hearing).

Petitioner asserts that his guilty plea was involuntary because he was informed that "if he did not accept a plea deal, he could have been subject to increased punishment under the gang enhancement statute." He also notes that the gang enhancement statute was unconstitutional. Initially, as pointed out by the State, the possibility being sentenced under the gang enhancement statute would not have rendered Petitioner's guilty plea involuntary. The entry of the guilty plea to avoid the risk of greater sentencing exposure does not render a plea involuntary. *Hicks v. State*, 983 S.W.2d 240, 248 (Tenn. Crim. App. 1998). Additionally, as Petitioner acknowledges, the United States Supreme Court has held that a petitioner's plea is also not rendered involuntary on the basis that a punishment he sought to avoid was later declared unconstitutional, as in this case. *See Brady v. United States*, 397 U.S. 742, 756 (1970).

In any event, Petitioner has failed to show that his guilty plea was involuntarily entered. As discussed above in this opinion, Petitioner has not shown that he actually faced sentencing under the gang enhancement statute. He did not testify at the post-conviction hearing, and trial counsel could not recall if the threat of gang enhancement even existed in Petitioner's case. The only proof presented at the post-conviction hearing was the handwritten document that read, "Or reset and look at gang stuff. Max @ 100%." Even if there was a threat of gang enhancement in Petitioner's case, he has not shown that trial counsel improperly advised him concerning the statute, which had not been ruled unconstitutional at the time of the plea. Petitioner is not entitled to relief on this issue.

**CONCLUSION**

For the reasons set forth above, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE